## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| A.D. an individual, | |
| Plaintiff, | |
| vs. | Case No.: 2:22-cv-00651 |
| BEST WESTERN INTERNATIONAL, INC.; and | COMPLAINT |
| APEX HOSPITALITY, LLLP, | DEMAND FOR JURY TRIAL |
| Defendant(s). | |

## **COMPLAINT**

COMES NOW the Plaintiff A.D. ("Plaintiff" or "A.D."), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.[1]

## **INTRODUCTION**

1.     For decades, criminal sex traffickers have brazenly operated in and out of hotels throughout this country. Victims of sex trafficking are taken to hotel and motel rooms to be repeatedly trafficked, sexually assaulted, demeaned and left with multiple unaddressed injuries, while hotel operators and hospitality giants pay lip service to campaigns against sex trafficking, turning a blind eye to criminal

---

[1] *See A.D. v. CorePoint Lodging*, No. 2:22-cv-00095-JES-NPM, ECF Nos. 157, 158.

misconduct and collecting profits from the criminal misconduct at the expense of human life, human rights, and human dignity.

2.    All Defendants know and have known for decades that sex trafficking repeatedly occurs at their respective locations and under their flags throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Defendants have instead chosen to ignore and thereby facilitate commercial sex trafficking on their properties, enjoying the monetary profit and other benefits stemming from rooms rented for the purpose of sex trafficking, while making no attempt to raise awareness or put an end to the repeated abuses of victims at their properties.

3.    This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials A.D., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.    A.D. was trafficked for commercial sex throughout Lee, Hillsborough, and Collier Counties in Florida.  A.D. was sold via commercial sex transactions at the Defendants' hotel property, where force, fraud, and coercion were used against her, while Defendants turned a blind eye and continued to benefit.

5.    A.D. was advertised for sex on various websites known for trafficking, whereby Defendants provided open access to these known websites permitting

traffickers and buyers to enable, facilitate, and otherwise assist in the harboring of A.D. for the purpose of sex trafficking.

6.      Upon information and belief, these websites were repeatedly used by the trafficker to control and arrange for A.D. to be sold repeatedly to buyers who frequented the Defendants' hotel property to purchase victims of sex trafficking, including A.D.

7.      With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures to act, mandate, establish, execute, and/or modify their anti-trafficking efforts on their hotel property, A.D. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotel.

8.      The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against the Defendants who, motivated by profits and the value of the "good will" of their brand, refused to institute meaningful steps to stop trafficking, and instead continued to operate a venture which enabled, harbored, held, facilitated, or any combination of the foregoing, the repeated and continuous trafficking, exploitation, and victimization of A.D. for their own benefit.

9.      The Plaintiff brings this action for damages against the Defendants listed herein for knowingly benefiting from facilitating a venture that they knew, or should have known, to be engaging in violations of the TVPRA.  Defendants

turned a blind-eye to more than a decade of direct knowledge regarding anti-trafficking efforts and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking.

## PARTIES

10.    Plaintiff A.D. is a natural person who resides in Collier County, Florida.

    a.    Plaintiff A.D. was living at home with her parents, fully employed and enrolled in college when she was first beckoned to a hotel where she was fraudulently induced, coerced and sexually assaulted before being sold for the purposes of commercial sex throughout Hillsborough, Collier, and Lee Counties. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (17) and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (16).

    b.    Due to the sensitive, private, and potentially retaliatory nature of the allegations, this Court has granted Plaintiff A.D.'s request to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter.[2]

11.    Defendant Best Western International, Inc. ("BWI") is one of the largest

---

[2] *A.D. v. CorePoint Lodging*, No. 2:22-cv-00095, ECF No. 159.

hotel brands in the world. It owns the Best Western Hotels & Resorts brand, which it licenses to over 4,700 hotels worldwide and is a global network of hotels.  It is an Arizona corporation with its headquarters located at 6201 North 24th Parkway, Phoenix, Arizona 85016.  It can be served by its registered agent Corporation Service Company, 2338 West Royal Palm Road, Suite J, Phoenix, Arizona 85021.

     a. Defendant BWI owns, supervises, operates, the Best Western® Hotels & Resorts brand and/or has it brand on approximately 4,700 hotels worldwide, including more than 2,000 in North America.

     b. Best Western® is a BWI brand property. BWI owns, supervises, and/or operates the Best Western® Fort Myers Inn & Suites ("BW Ft. Myers") located at 4400 Ford Street, Fort Myers, Florida 33916.

     c. Defendant BWI conducts and operates business throughout the state of Florida.

     d. BWI is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida; derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the Best Western hotels; has caused indivisible injuries to A.D. in Florida; and profited from illegal sex trafficking involving Plaintiff at its hotels.

     e. BWI is the principal in an agency relationship with the Best Western

hotels.  In addition to BWI's liability under TVPRA section 1595, BWI is vicariously liable for the acts and/or omissions of the staff at its Best Western hotels and all of its franchisee hotels.

f.  The Best Western hotels where Plaintiff was trafficked have apparent agency for BWI so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

g.  BWI has ratified the actions and inactions of the Best Western hotels.

h.  BWI exercises day-to-day control over the Best Western hotels, including the BW Ft. Myers, through its brand standards and retains control over the Best Western hotels under the terms of its franchise agreement.

i.  Defendant BWI and the BW Ft. Myers are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Best Western® hotel where the Plaintiff was trafficked for sex. Defendant BWI and the Best Western® each share the common policies and practices complained of herein.

j.  Defendant BWI and the BW Ft. Myers jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

k.  As an integrated enterprise and or joint employer, Defendant BWI

and the BW Ft. Myers are separately and jointly responsible for compliance with all applicable laws.

l.  As an integrated enterprise and or joint employer, Defendant BWI and the BW Ft. Myers are jointly and severally liable for any damages caused by employees.

m. Defendant BWI and the BW Ft. Myers are considered employers under federal labor regulations.

n.  As hotel operator, Defendant BWI controls the training and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the BW Ft. Myers hotel where A.D. was trafficked.

o.  Defendant BWI maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with BWI brand standards and all local, state, and federal laws.

p.  Defendant BWI maintains data in server logs and internet files that could be used to help prevent human trafficking, but it fails to use this data for the prevention of human trafficking.

q.  Upon information and belief, Defendant BWI controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any

standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by BWI, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Best Western ® hotel where Plaintiff was trafficked

r.  Through BWI's relationship with the staff at the Best Western hotel where A.D. was trafficked and where traffickers of Plaintiff were guests or visitors, BWI knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known violated the TVPRA through, *inter alia*, royalty payments, licensing fees, and percentages of the gross room revenue which BWI is entitled to under the franchise agreements.

s.  BWI benefits financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

t.  BWI has benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

12.    Defendant Apex Hospitality, LLLP ("Apex"), doing business as the Best Western® Fort Myers Inn & Suites ("BW Ft. Myers"), is a Florida limited liability limited partnership and is one of Defendant BWI's branded properties. Defendant Apex was involved in the staffing and operation of the Best Western hotel located at 4400 Ford Street, Fort Myers, Florida 33916 where the Plaintiff was trafficked for sex. Through its relationship with Defendant BWI and the perpetrators who trafficked A.D. at the BW Ft Myers, Defendant Apex knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had violated the TVPRA. Defendant Apex may be served with service of process by serving its registered agent, Sanmukh Swami at 17761 San Carlos Boulevard, Fort Myers Beach, Florida 33931.

13.    Defendant Best Western International, Inc. ("BWI") may be referred to as the "Brand Hotel Defendant."

14.    Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management,

direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

15.    This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States and this Court has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

16.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000).

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action was brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

18.    The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture,

(3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

19.    Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."  This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

20.    To best understand the mechanism by which sex trafficking is prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

21.    Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, it is nevertheless a long- recognized and familiar atrocity.

## FACTUAL ALLEGATIONS

### A.  BRAND HOTELS CONTROL THE HOSPITALITY INDUSTRY

22.    Upon information and belief, between at least 2008 to 2012, Defendant BWI held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed

23.    Upon information and belief, between at least 2008 to 2012 the Brand Hotel Defendants held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

24.    Upon information and belief, during at least 2008 to 2012, emails were exchanged by employees of Defendants' respective brands that related to sex trafficking in hotels, including Defendants' hotels.

25.    As industry leaders, Defendants each failed to articulate policy, process, or procedure that would measure the extent of the trafficking problem at their branded locations. They essentially all allowed their colleague brands to perpetuate the lie that sex trafficking was not a problem on their brand properties. Moreover, Defendants did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected instances of human trafficking.

26.    Defendants collectively declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. As a

whole, Defendants did not call for stricter room rental requirements. For example, Defendants did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room; did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash), and did not monitor reservation patterns maintained and owned by their brand central reservation systems, data of which could only be analyzed by the brand Defendant with backend access.  In short, Defendants refused to communicate to traffickers "your business and your money are not welcome here."

27.    Through this coordinated effort, Defendants were able to rest assured they would not have to implement effective policies and procedures. Given that human trafficking does more than $100 billion in business a year and the fact that a large percent of all sex trafficking occurs at hotels and motels—there can be no doubt that Defendants, as an industry, generate billions of dollars every year from human trafficking.

28.    Defendants' coordinated efforts created an industry standard of giving lip service to tackling human trafficking while in practice implementing nothing meaningful or effective. Defendants guaranteed that they would not have to compete with a national branded property that put together a policy that eliminated trafficking from their branded properties. While it would be

challenging and expensive (both business expenses and lost revenues from traffickers) to implement effective policies, it is apparent that an effective policy would create a long term competitive advantage for the individual defendant. In short, a business that implemented an effective policy could easily provide reportable data on how it reduced trafficking at its brand properties. Moreover, it could exploit the fact that other defendants are completely ignoring that a problem exists at their brand properties. The complying hotel could explain how other brand hotels will never be able to effectively battle the problem until they admit it exists on their properties. Thus, in the long run, an effective policy would generate public support and create brand loyalty, resulting in greater revenues and profits.

### B. THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTEL

29.    Defendants have been on notice of repeated incidences of sex trafficking occurring at their brand hotel, yet they failed to take the necessary action to meaningfully address sex trafficking and still persist in failing to take the necessary action to meaningfully address sex trafficking at their hotel.

30.    Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[3]

---

[3] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

31.    Defendant BWI had actual and/or constructive knowledge of sex trafficking, including A.D.'s sex trafficking and victimization, occurring on its branded properties via the following:

    a.  Defendant BWI owns, supervises, or operates the Best Western® located at 4400 Ford Street, Fort Myers, Florida 33916. BWI failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

    b.  Defendant BWI had actual knowledge of sex trafficking occurring on its branded hotel properties because BWI and BW Ft. Myers knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. BWI and BW Ft. Myers allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Best Western. BWI and BW Ft. Myers facilitated the trafficking through its practices, policies, and procedures. BWI and BW Ft. Myers failed to take appropriate action to prevent the trafficking of individuals for sex so that BWI and BW Ft. Myers could continue to profit from the business that trafficking brings, including business

from out-of-state.

c.   Defendant BWI had constructive knowledge of sex trafficking occurring on its branded hotel properties because BWI and BW Ft. Myers knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. BWI and BW Ft. Myers allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Best Western. BWI and BW Ft. Myers facilitated the trafficking through its practices, policies, and procedures. BWI and BW Ft. Myers failed to take appropriate action to prevent the trafficking of individuals for sex so that BWI and BW Ft. Myers could continue to profit from the business that trafficking brings, including business from out-of-state.

d.   BWI knew or should have known that the BW Ft. Myers hotel where Plaintiff A.D. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.D. was trafficked.

e. Best Western brand hotel properties know and have known for more than a decade that criminal sex trafficking of adults and children repeatedly occurs on their properties throughout the country. Rather than take timely and effective measures to prevent human trafficking, Best Western brand hotels, and their respective parent companies, have instead failed to address the open and obvious presence of human trafficking on hotel properties and continue to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

f. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant BWI has repeatedly failed to stop these actions.

g. BWI was in an agency relationship with Best Western® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant BWI's exercise of an ongoing and systemic right of control over Best Western® hotels by Defendant BWI operations, including the means and methods of how Best Western® branded hotels conducted daily business through one or more of the following actions:

i. providing the software, hardware, and platforms where

suspicious activity or other concerns should be addressed with the Brands;

ii. providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

iii. providing new hire orientation on human rights and corporate responsibility;

iv. providing training and education to Best Western® branded hotels through webinars, seminars, conferences, and online portals;

v. providing and controlling customer review and response platforms

vi. hosting online bookings on Defendant BWI's domain;

vii. requiring Best Western® branded hotels to use Defendant BWI's customer rewards program;

viii. requiring Best Western® branded hotels to use Defendant BWI's property management software;

ix. requiring Best Western® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x. providing IT support for all property management

systems, owned, operated and required by BWI;

xi.   setting employee wages;

xii.  making employment decisions;

xiii. advertising for employment;

xiv.  sharing profits;

xv.   the ability of Defendant BWI to cancel any agreement with the Best Western® if rules are violated;

xvi.  regular inspection of the Best Western® hotels and operations or management by Defendant BWI;

xvii. standardized training methods for employees;

xviii. building and maintaining the facility in a manner specified by the owner;

xix.  standardized or strict rules of operation;

xx.   regular inspection of the facility and operation by owner;

xxi.  fixing prices; or other actions that deprive Best Western® branded hotels of independence in business operations.

h.  An apparent agency also exists between Defendant BWI and Best Western® hotels. Defendant BWI held out Best Western® branded hotels to the public as possessing authority to act on its behalf.

i.  Given Defendant BWI's public statements on behalf of its hotel

brands and the control it assumed in educating, implementing, and directing its branded hotels, including Best Western® branded hotels, Defendant BWI breached its duties in the following ways:

 i. did not adequately distribute information to assist employees in identifying human trafficking;

 ii. failed to mandate a process for escalating human trafficking concerns within the organization;

 iii. failed to mandate managers, employees, or owners attend training related to human trafficking;

 iv. failed to provide new hire orientation on human rights and corporate responsibility;

 v. failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

 vi. failed to develop and hold or require ongoing training sessions on human trafficking;

 vii. failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

      viii.   failed to evaluate universal reservation systems for suspicious booking activities;

      ix.   failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

      x.   failed to ban cash or prepaid credit cards as payment; and

      xi.   failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

j. For years, Defendant BWI has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Best Western® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.D. at BW Ft. Myers hotel that forms the basis of this complaint.

      i.   In July 2007, a manager of two Best Western hotels publicly announced that they had banned "prostitution related activities" on their premises, which included training employees how to identify prostitution and denying entry

to suspected prostitutes and their clients.[4]

ii.   In October 2007, a Best Western construction in the middle of an industrial area raised concerns from the local community about the hotel becoming a den of prostitution. Community board members and residents requested the hotel's owner to answer all of their questions about the site and provide details about the rooms, management, parking, and security. The building of hotels in industrial areas had become such a problem that the Borough President had called for a moratorium on such facilities in industrial areas.[5]

iii.   In October 2008, two women were arrested on drug charges in a prostitution sting and eight men were arrested for soliciting sex at the Best Western Hotel in Rockland.[6]

iv.   In April of 2010, the Christian Brothers Investment Services ("CBIS"), members of the Interfaith Center on

---

[4] *Businesses Say No to Sex Tourism Industry*, THE TICO TIMES (Jul. 27, 2007), https://ticotimes.net/2007/07/27/businesses-say-no-to-sex-tourism-industry.
[5] *Residents worry hotel may become den of prostitution*, NY DAILY NEWS (Oct. 30, 2007), https://www.nydailynews.com/new-york/bronx/residents-worry-hotel-den-prostitution-article-1.232160
[6] *One alleged prostitute is a former Marshfield High honor student*, THE PATRIOT LEDGER (Oct. 28, 2008), https://www.patriotledger.com/article/20081028/NEWS/310289571.

Corporate Responsibility, and 300 investors and faith-based organizations sent a letter to major hotel chains, including Best Western, to learn about actions being taken to combat human trafficking in advance of the World Cup. The final results of the initiative specifically noted that Defendant BWI "lack[s] programs to deal with child sexual exploitation."[7] CBIS' efforts were applauded by BWI, but ultimately ignored as BWI deflected its responsibility to prevent human trafficking elsewhere.[8]

v.    In December of 2013, authorities caught a man trafficking women from his jail cell. The man would post online advertisements of the girls and send them to service clients at the Best Western in Rockville, Maryland.[9]

vi.    In October of 2017, a man plead guilty to trafficking a 16 year-old girl out of a Best Western in Arlington, Virginia.

---

[7] Christian Brothers Investment Services, *Final Results of the Initiative On Hotels and Human Trafficking at the World Cup*, at 2 (2010).

[8] Response of Best Western International to the appeal of Christian Brothers Investment Services to take action to prevent human trafficking in South Africa, *available at* https://www.business-humanrights.org/sites/default/files/reports-and-materials/Best-Western-response-re-CBIS-trafficking-appeal-3-June-2010.doc

[9] *Inmate May Have Run Prostitution Ring From Jail*, NBC WASHINGTON, (Dec. 18, 2013), available at https://www.nbcwashington.com/news/local/inmate-may-have-run-prostitution-ring-from-jail/2042829/

The man trafficked the minor through numerous states, posted advertisements of her online, and took all of the profit.[10]

k. Additionally, Defendant BWI has been aware of sex trafficking on Best Western brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Best Western brand properties and Defendant BWI's inattentiveness, for example:

   i. In January of 2013, a reviewer described the Best Western in Galveston, Texas as follows: "There was criminal activity in the parking lot - prostitutes and our car was broken in to and the gas and gas cap were actually stolen!"[11]

   ii. Regarding a March 2016 stay at a Best Western Executive Inn in Seagoville, Texas, a customer wrote: "…At night there was a pimp and prostitute argument and the front

---

[10] *Pimp Pleads Guilty to Sex Trafficking Teen in Arlington*, ARLNOW.com (Oct. 20, 2017), available at https://www.arlnow.com/2017/10/20/pimp-pleads-guilty-to-sex-trafficking-teen-in-arlington/

[11] Review of the Best Western Plus (Jan. 25, 2013), available at https://www.tripadvisor.com/ShowUserReviews-g55879-d223635-r150605283-Best_Western_Plus_Seawall_Inn_Suites_By_The_Beach-Galveston_Galveston_Island_Texas.html

desk allowed this to happen. Very loud until early in the morning. The front desk allows prostitution at night. Told the morning shift about it they didn't care…"[12]

l.  Upon information and belief, Defendant BWI monitors customer reviews and complaints for all brand properties.

m. Upon information and belief, the branded properties depend on Defendant BWI for notification of negative customer reviews.

n.  Upon information and belief, Defendant BWI, not the branded properties, houses and controls the data regarding customer reviews.

**C.    THE SEX TRAFFICKING OF A.D. AT BEST WESTERN FORT MYERS**

32.    One of the lives devalued and otherwise adversely affected by the hospitality industry's inattention to the prevention and eradication of sex trafficking was that of A.D.

33.    In November of 2011, A.D. met a man who she was interested in ("hereinafter referred to as "Trafficker 2"). He took advantage of her innocence and forced her into a sexual encounter. Trafficker 2 subsequently courted her and manipulated her into thinking they were in love. While "dating," Trafficker 2

---

[12] Review of Best Western Executive Inn, Seagoville, TX (Mar. 23, 2016), *available at* https://www.tripadvisor.com/ShowUserReviews-g56648-d73227-r357822545-Best_Western_Executive_Inn-Seagoville_Texas.html.

would manipulate A.D. into numerous non-consensual sexual encounters; forced her to take drugs; and take the blame for his criminal acts. Trafficker 2 would consistently take advantage of A.D. and would soon traffick her in hotels throughout Central Florida.

34.    After months of "dating," Trafficker 2 suggested A.D. move in together. Because he was a convicted felon and registered sex offender, he forced A.D. to enter into a lease agreement. In order to make money to sustain their life together, Trafficker 2 suggested A.D. work to make extra money.

35.    Under the ruse of a modeling job advertised on Backpage.com, Trafficker 2 forced A.D. to work. During her "interview" for the modeling job, A.D. met a man (hereinafter referred to as "Trafficker 1") who raped her into submission at the Best Western Naples.

36.    While victimized by her traffickers, A.D. was subjected to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotel property in approximately February of 2012.

37.    Plaintiff A.D. was subjugated to sex trafficking at the Best Western® Fort Myers located at 4400 Ford St, Fort Myers, FL 33916, in approximately February of 2012.

38.    Trafficker 1 rented rooms at the Best Western® Fort Myers for the

26

purpose of selling A.D. for sex.

39.     Trafficker 1 forced A.D. to perform commercial sex acts for two or three days at the Best Western® Fort Myers. A.D. would come to the hotel early in the morning and leave in the evening to return the next morning.

40.     A.D. was forced to perform commercial sexual acts with up to 10 to 15 buyers a day. Accordingly, the traffic and parade of men – all white between the ages of 25 to 80 years old – coming in and out of the Best Western® Fort Myers was tremendous. Up to 30 men over a period of two or three days arriving at the Best Western® Fort Myers rooms rented by her trafficker.

41.     This procession of men would have been open an obvious to anyone working at the Best Western® Fort Myers. These sex buyers were not registered guests.

42.     While being forcefully raped by sex buyers at the Best Western® Fort Myers, A.D. was not allowed to leave the hotel room. Instead, the trafficker would arrange buyers and tell them which room to go to.

43.     Trafficker 1 would stop by A.D.'s room to collect money multiple times a day after each "rush" of sex buyers.

44.     The Best Western® Fort Myers security cameras undoubtedly filmed a great deal of this obvious traffic as well as the victim A.D. as she entered and left the premises. No one at the corporate level apparently ever utilized their alleged

mandated surveillance and security to prevent the flagrant sex trafficking of A.D. from occurring on the Best Western® Fort Myers hotel premises.

45.     Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

    a.  Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

    b.  Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

    c.  A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

    d.  A continuous procession of men entering and leaving A.D.'s room;

    e.  Excessive requests for sheets, cleaning supplies, towels, and room service;

    f.   The personal relationship between various hotel staff and A.D.'s trafficker; and

    g.  The direct employee encounters with A.D. and her trafficker inside the Best Western® Fort Myers.

**D.     THE DEFENDANTS FACILITATED THE TRAFFICKING OF A.D.**

46.     Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided, enabled, and facilitated the sex trafficking of A.D. The Defendants leased rooms to A.D.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject A.D. to repeated exploitation as he forced her into sexual servitude.

47.     Defendants knew, or should have known, that A.D. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because A.D.'s trafficker frequented the Defendants' hotel.

48.     Defendants knew, or should have known, that A.D. was being trafficked because A.D. constantly entertained traffic to appease her traffickers' daily quotas and their behavior indicated they were using the Defendants' hotels for his illegal sex trafficking activities.

49.     Defendants actively participated in this illegal endeavor by knowingly or negligently providing lodging in which to harbor A.D. while he was trafficking her.

50.     Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided and participated with A.D.'s trafficker with his criminal activity. The Defendants took no action as A.D. was trafficked at the hotel, often with different guests, avoiding eye contact, and dressing inappropriately for the weather.

51.     The Defendants all had the opportunity to stop A.D.'s trafficker and offenders like him from victimizing A.D. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotel.

52.     The Defendants all financially benefited from the sex trafficking of A.D., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

53.     Defendants benefit from the steady stream of income that sex traffickers bring to their hotel brands.

54.     Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

55.     Defendants have long been aware that free Wi-Fi is attractive to traffickers yet failed to provide adequate security to protect Plaintiff, including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

56.    Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

57.    Defendants maintained their deficiencies to maximize profits by:

a. Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b. Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Not refusing room rentals, or reporting guests to law enforcement,

in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation.

58. As a direct and proximate result of these egregious practices on the part of the Defendant Hotel, A.D. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**CAUSES OF ACTION**
**A.    COUNT ONE – 18 U.S.C §1595 ("TVPRA")**
**(Against all Defendants)**

59. The Plaintiff A.D. incorporates each foregoing allegation.

60. A.D. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

61. The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of

18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in a venture which facilitated the harboring and providing of A.D. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

62.     The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of A.D. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotel. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.D.'s injuries and damages.

63.     A.D. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotel and property in violation of 18 U.S.C. §1591(a).

## **PRAYER FOR RELIEF**

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a.  All available compensatory damages for the described losses with respect to each cause of action;

b.  past and future medical expenses, as well as the costs associated with past and future life care;

    a.  past and future emotional distress;

    b.  consequential and/or special damages;

    c.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    d.  disgorgement of profits obtained through unjust enrichment;

    e.  restitution;

    f.  punitive damages with respect to each cause of action;

    g.  reasonable and recoverable attorneys' fees;

    h.  costs of this action; and

    i.  pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other

damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated:  October 11, 2022                         **RESPECTFULLY SUBMITTED,**

*/s/ Kathryn L. Avila*
**Kathryn L. Avila** (Fla. Bar No. 1019574)
**Emmie J. Paulos** (Fla. Bar No. 99010)
LEVIN PAPANTONIO RAFFERTY
316 S. Baylen St. Suite 600
Pensacola, Florida 32502
T: 850-436-6246
F: 850-436-6271
E: kavila@levinlaw.com / epaulos@levinlaw.com

*Attorneys for Plaintiff*